562 F.Supp. 651 (1983)
UNITED STATES of America
v.
H & M, INC., RSE, Inc., William H. Quigley, Jr., D. Robert Rimmer, Walter E. Rimmer.
Crim. Nos. 82-00040-01, 82-00040-02, 82-00040-04, 82-00040-05 and 82-00040-06.
United States District Court, M.D. Pennsylvania.
March 22, 1983.
*652 *653 *654 *655 Richard A. Small, Antitrust Div., Dept. of Justice, Philadelphia, Pa., for plaintiff.
P. Daniel Altland, Harrisburg, Pa., for H & M, Inc. and William H. Quigley, Jr.
Charles W. Boohar, Pelino & Lentz, Philadelphia, Pa., for RSE, Inc., D. Robert Rimmer and Walter E. Rimmer.

MEMORANDUM
RAMBO, District Judge.
The four individual defendants and two corporations in this action were charged with a conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The trial of all defendants resulted in a jury verdict of guilty against all defendants. On September 3, 1982 defendant Jack D. Murphy died. On October 1, 1982 a joint motion of dismissal of the charges and an abatement of the proceedings as to Jack D. Murphy was filed. The motion was granted by order of this court on the same date.
Now pending before the court are the post-trial motions of H & M, Inc., RSE, Inc., William H. Quigley, Jr., D. Robert Rimmer and Walter E. Rimmer. All the defendants have moved under Rule 29 of the Federal Rules of Criminal Procedure for judgment of acquittal on the grounds that there was insufficient evidence to support the verdict. Defendants RSE and the Rimmers allege the evidence was insufficient to prove their acts were within the ambit of the Sherman *656 Act. They have also moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure alleging that the verdict was contrary to the weight of the evidence or that trial error was committed. Defendants H & M, Inc. and William H. Quigley, Jr. have moved for an arrest of judgment under Rule 34 of the Federal Rules of Criminal Procedure alleging that the indictment does not charge an offense and that the court is without jurisdiction.

I. Interstate Commerce
Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies "in restraint of trade or commerce among the several States." 15 U.S.C. § 1 (1976). This phrase both defines the conduct prohibited by the Statute and its jurisdictional reach. Western Waste Service Systems v. Universal Waste Control, 616 F.2d 1094, 1096 (9th Cir.) cert. denied, 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980). The jurisdictional requirement may be satisfied under either the "effect on commerce" or the "in commerce" theory. McLain v. Real Estate Board of New Orleans, 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980).
Defendants have moved this court to find that the Government has neither sufficiently alleged in the indictment nor proved at trial that motopaving in the four-county area of Dauphin, Cumberland, Perry and Lebanon affected interstate commerce or was in the flow of commerce. Specifically, defendants H & M, Inc., Quigley, contend that the indictment must allege either that the complained of activities affected interstate commerce or that the conspiracy involved a product in the flow of interstate commerce. Defendants RSE, Inc. and the Rimmers contend the evidence was insufficient at trial to show the requisite interstate nexus. The court will first examine defendants' arguments concerning the affect on commerce test.
In McLain[1] the Court held that it was unnecessary for the alleged antitrust violations to have affected interstate commerce as long as defendants' business activities, independent of the violations, affected interstate commerce. The Court stated:
To establish jurisdiction a plaintiff must allege the critical relationship in the pleadings and if these allegations are controverted must proceed to demonstrate by submission of evidence beyond the pleadings either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce... To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful. 444 U.S. at 242, 243, 100 S.Ct. at 509, 510.
The McLain Court then used a two part test to examine the record as it stood to determine if petitioners had a sufficient basis to proceed to trial to establish Sherman Act jurisdiction. The Court first found that an appreciable amount of interstate commerce was involved in the financing of residential property in the Greater New Orleans area and in the insuring of titles to such property. The Court then examined whether the defendants' activities "which allegedly had been infected by a price-fixing conspiracy ... [had]" as a matter of practical economics" ... a not insubstantial effect on the interstate commerce involved." 444 U.S. at 246, 100 S.Ct. at 511 (citation omitted). The Court found that:
Brokerage activities necessarily affect both the frequency and the terms of residential *657 sales transactions. Ultimately, whatever stimulates or retards the volume of residential sales, or has an impact on the purchase price, affects the demand for financing and title insurance, those two commercial activities that on this record are shown to have occurred in interstate commerce. Where, as here, the services of respondent real estate brokers are often employed in transactions in the relevant market, petitioners at trial may be able to show that respondents' activities have a not insubstantial effect on interstate commerce. Id.

The McLain decision has not been interpreted consistently by the circuit courts. The Ninth Circuit has held that Sherman Act jurisdiction exists when any business activity of a defendant affects interstate commerce. Western Waste Service, 616 F.2d at 1097; Ronwin v. State Bar of Arizona, 686 F.2d 692 (9th Cir.1981). Under a more conservative view of McLain, the Tenth and First Circuits have stated that a plaintiff must point to the relevant channels of interstate commerce logically affected by the defendant's unlawful conduct. Crane v. Intermountain Health Care, Inc., 637 F.2d 715 (10th Cir.1980); Cordova & Simonpietri Ins. v. Chase Manhattan Bank, 649 F.2d 36 (1st Cir.1981).
The parties have not cited any opinions from the Third Circuit Court of Appeals interpreting McLain.[2] This court concludes that the Ninth Circuit's approach is consistent with McClain's language and application. McElhinney v. Medical Protective Co., 549 F.Supp. 121, 127 (E.D.Ky.1982). Contra, Pao v. Holy Redeemer Hospital, 547 F.Supp. 484 (E.D.Pa.1982). The court therefore rejects defendants' contentions that the conspiratorial activities themselves must affect interstate commerce. The court will now examine the indictment and the Government's proof at trial under McLain as interpreted by the Ninth Circuit to determine if the "affect on commerce test" has been met.
The allegations of the indictment pertaining to the connection between the alleged conspiracy and interstate commerce are as follows:
During the period of time covered by this indictment the defendants and co-conspirators performed motopaving work in the four county area. In that area they bid for motopaving contracts let by various governmental bodies including townships and boroughs.
During the period of time covered by this indictment, there was a substantial, continuous and uninterrupted flow of liquid bituminous material from suppliers outside the Commonwealth of Pennsylvania to job sites in the four county area and to processing plants in the Commonwealth of Pennsylvania for use by the defendants and co-conspirators, for motopaving projects within the four county area.
During the period of time covered by this indictment, essential equipment was used in the business of motopaving by defendants and co-conspirators, in the four county area, which equipment had been purchased and transported from locations outside the Commonwealth of Pennsylvania.
During the period of time covered by this indictment, the activities of the defendants and co-conspirators which are the subject of this indictment were within the flow of, and substantially affected, interstate commerce.
At trial the government proved the following facts. Crushed aggregate and liquid asphalt are the two major ingredients in motopaving (N.T. p. 45). The bulk, if not all, of the asphalt used by the motopaving companies in the four-county area came from refineries in Baltimore, Maryland (N.T. pp. 52, 56, 156-157, 262-265, 337, 571, 1135). The asphalt is the most expensive product of the blacktop mix (N.T. pp. 1063, 1135). There was evidence that on some days no trucks delivered the asphalt, on *658 some days as many as four or five trucks would be dispatched to jobs (N.T. p. 53). Each truck load carried approximately 5000 gallons (N.T. pp. 53, 1265) with a cost of about $1500.00 in 1977. The cost varied during the years from 1972 to 1980 from .15 cents to .75 cents per gallon (N.T. p. 266).
Evidence was also presented to show that some bonding companies used by motopaving contractors in the four-county area for bid, performance and payment bonds were located outside the Commonwealth of Pennsylvania.[3]See e.g. Gov't.Ex. 311-E and Gov't.Exs. 300-E, F, G and H. One motopaving contractor testified that the cost of the performance bonds was one percent of the contract price (N.T. p. 130).
In addition there was testimony that the equipment used in motopaving in the four-county area was purchased out of state (N.T. pp. 46-47, 151, 266, 1030-31). While there was no testimony indicating how often equipment was purchased, there was testimony that the cost of one machine was $135,000. (N.T. p. 84).
Applying the two step analysis of McLain, it is evident that an appreciable amount of interstate commerce is involved in motopaving in the four-county area specified in the indictment. This commerce consists of liquid asphalt purchased from Baltimore, performance bonds purchased from companies located in New Jersey and New Hampshire, and essential motopaving equipment purchased from companies in Indiana, New York and Massachusetts. Furthermore, it is clear that defendants' activities, i.e. motopaving in the four-county area, which allegedly have been infected by a conspiracy to allocate customers, rig bids and fix prices on motopaving projects in the same area, have as a matter of practical economics, a not insubstantial effect on the previously identified channels of interstate commerce. The above testimony established the effect of defendants' motopaving activities on the purchase of interstate liquid asphalt, performance bonds and essential equipment. The Government's evidence was sufficient to prove the nexus between interstate commerce and motopaving in the four-county area. The court concludes that the effect on commerce has been met.
Defendants also contend that the Government failed to allege and prove that motopaving was in the flow of commerce and that the court, by charging the jury on this theory, committed reversible error. The court finds no grounds requiring a new trial on these allegations.
The pertinent aspects of the indictment and testimony discussing interstate commerce have been set forth above. The Government contends that testimony as to the composition and manufacturing process of motopaving plus testimony about the source of liquid asphalt used for motopaving clearly established that liquid asphalt and thus motopaving itself was within the flow of interstate commerce. Specifically, the Government points to testimony from Ward Wilson which established that the sole ingredients of motopaving are crushed stone and liquid asphalt (N.T. p. 45). Wilson also described the motopaving process as follows:
There is a dump truck in front of it (the motopaver). The dump truck in front is dumping stone into the front hopper. That stone travels through into the middle of the paver to the mixer. There's a big tank on the front here. You fill that tank with liquid asphalt before you start and also each time it runs empty.
Inside the paver, there's a mixer. It is a paddle type thing that beats around. The two materials both flow into that, are mixed together. They come out and are spread with augers to each side of the machine and comes (sic) out the back ready to roll. (N.T. p. 49)
*659 Previously cited testimony established that liquid asphalt, which the Government contends was the principal ingredient in terms of cost, came from Baltimore. The Government argues that the only intervening step between importation of the liquid asphalt from Baltimore and its placement on the road was the addition of the stone. No testimony was offered to establish that the physical characteristics of the asphalt were altered by the motopaver. On these facts, the Government analogizes to, among other cases, Rasmussen v. American Dairy Association, 472 F.2d 517 (9th Cir.), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973) to support its theory that the alleged restraint occurred within the flow of commerce.
Defendants RSE, Inc. and the Rimmers argue in their reply brief that the above facts and case law fail to establish that motopaving was in the flow of commerce. They contend that the liquid asphalt component of motopaving has undergone more than negligible processing and that its character has appreciably been altered. They cite this court's previous decision in RSE, Inc. v. Pennsy Supply, Inc., 489 F.Supp. 1227 (M.D.Pa.1980) in support of their argument. This court finds its earlier opinion arguably distinguishable. In RSE, Inc., the court addressed the processing and components of asphaltic concrete known as hot mix to determine if the sale of liquid asphalt purchases were sufficient to place the sale of stone aggregate in the stream of commerce. The court cited the following descriptive statement from Gulf Oil Corporation v. Copp Paving Company, Inc., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) concerning the processing of hot mix:
Asphaltic concrete is a product used to surface roads and highways. It is manufactured at "hot plants" by combining at temperatures of approximately 375° F, about 5% liquid petroleum asphalt with about 95% aggregate and fillers. The substance is delivered by truck to construction sites, where it is placed at temperatures of about 275° F. Because it must be hot when placed and because of its great weight and relatively low value, asphaltic concrete can be sold and delivered profitably only within a radius of 35 miles or so from the hot plant. 489 F.Supp. at 1235.
This court further stated in RSE, Inc. that to make the hot mix, stone, asphalt cement and other ingredients were mixed and treated to produce an entirely different product. 489 F.Supp. at 1235 (emphasis added). The court finds the above processing description of hot mix arguably distinguishable from the processing of motopaving described by witnesses Wilson and Rimmer (N.T. pp. 49, 1054, 1056, 1060). Furthermore, defendants point to no testimony addressing the alteration of the physical characteristics of the liquid asphalt. This court also notes that the Seventh Circuit in United States v. Azzarelli Construction Co., 612 F.2d 292, 295 (7th Cir.1979) stated that "It is doubtful whether, even under the `flow' theory such a change (chemical and molecular change or the creation of a new product, when crude oil and asphaltic cement were combined to make bituminous concrete) would suffice to render § 1 of the Sherman Act inapplicable." While the Seventh Circuit did not definitively decide if bituminous concrete was within the flow, this court finds its statement helpful.
Defendants RSE, Inc. and the Rimmers also seek to discredit the Government's reliance on Rasmussen. The court finds no significant distinctions. In Rasmussen, the principal ingredients of the filled milk product "Go" traveled in interstate commerce. Only water which made up the major portion of "Go" in terms of volume and weight was locally supplied. The court found that "Go" was "in" commerce. In the instant case, liquid asphalt which travels in interstate commerce makes up, in economic terms, the major portion of motopaving (See N.T. pp. 53, 266). Although defendants allege that stone aggregate was carefully considered in calculating the price of motopaving and thus cannot be considered economically de minimus as was the water in Rasmussen, this court disagrees. While testimony established that the cost of stone was a factor in calculating bids (N.T. pp. *660 90-91, 797, 1054, 1057-58) the only figure given in those portions of testimony was an estimate of 18 cents per ton for 1-B stone (N.T. p. 1054). No further specific costs have been cited by defendants. On this basis, the court is justified in concluding that the cost of stone, in comparison to liquid asphalt was de minimus. The court finds these facts sufficient to warrant congressional regulation of interstate commerce under § 1 of the Sherman Act.

II. Jury Instructions on Interstate Commerce
Defendants H & M and Quigley further contend that the court erred in instructing the jury on the "flow" test because the facts failed to support such a theory. The relevant portions of the court's instructions are set forth at N.T. pp. 1459-1464. Defendants RSE, Inc. and the Rimmers contend that the court's charge on the "flow" test amounted to a directed verdict because it failed to include the defendants' contention that motopaving could not be considered in the flow of interstate commerce.[4]
Assuming without deciding that the court erred in instructing the jury on the "flow" test, no reversible error was committed. The general rule is that where alternative theories are presented to the jury, one erroneous and prejudicial, and the other correct, the error is prejudicial since it is impossible to tell which theory the jury followed. Nicola v. United States, 72 F.2d 780, 787 (3d Cir.1934).
There is no prejudice, however, when, in order for the jury to find an essential element of crime based on the erroneous instruction, it must necessarily have found every fact essential to support a finding of the same element based on the alternative, correct charge. See United States v. Jacobs, 475 F.2d 270 (2d Cir.1973), cert. denied, sub nom., Lavelle v. United States, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1974). In Jacobs, the court stated:
Whether the jury found Lavelle and Jacobs guilty on the first [incorrect] theory submitted to it, or on the second [correct theory], or on both, there is thus no uncertainty that the jury found every fact necessary for a valid conviction.... 475 F.2d at 283-84.
See generally, United States v. Baratta, 397 F.2d 215 (2d Cir.), cert. denied, 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276 (1968), reh. denied, 393 U.S. 1045, 89 S.Ct. 613, 21 L.Ed.2d 597 (1969).
The case at hand provides identical circumstances to those in Jacobs. For the jury to have found interstate commerce on the basis of the court's instruction on the "flow of interstate commerce" theory, it must necessarily have found that a principal ingredient of motopaving in the four-county area was liquid asphalt which was transported in interstate commerce. Such finding of facts also establishes every element necessary to a finding of interstate commerce under the court's instruction on the "affect on interstate commerce" theory. Consequently, regardless of the theory on which the jury based its finding, it is evident that the jury found every fact necessary to establish the requisite nexus between motopaving in the four-county area and interstate commerce.
Defendants H & M, Inc. and Quigley also allege error in the court's refusal to give their proposed jury instructions numbers two and three.[5] The court has adequately *661 addressed the inappropriateness of these instructions in the foregoing paragraphs addressing the jurisdiction requirements of the Sherman Act.

III. Jury Instruction on Continuing Conspiracy
Defendants RSE, Inc. and the Rimmers further contend that the court erred in its charge with regard to adequately informing the jury of the Government's burden of proving defendants' membership in one continuing conspiracy. In support of their allegation, defendants cited two portions of the court's charge. One citation dealt with the statute of limitations and was taken out of context (N.T. pp. 1456-1457).
The adequacy of jury instructions is determined by examining the instructions as a whole. U.S. v. Palmeri, 630 F.2d 192, 201 (3d Cir.1980), cert. denied, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981). The pertinent parts of the court's instruction on the contested issue are as follows:
The indictment defines the exact nature of the charge against these defendants. The defendants are entitled to rely upon the indictment as a fair statement of the issues of this case, and none of them may be convicted upon other allegations or charges for which they have not been indicted (N.T. p. 1442).
You are, therefore, to evaluate the evidence in this case in relation to the charge made in the indictment. That is, you must determine whether it is proved to your satisfaction beyond a reasonable doubt that any, some, or all of the defendants are guilty of the charges specified in the indictment.
. . . . . .
Now, the indictment charges that beginning at least as early as 1967 and continuing thereafter until at least September of 1977, the defendants and other co-conspirators engaged in a combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act and that this combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the defendants and co-conspirators (N.T. pp. 1443-44).
What must be proved beyond a reasonable doubt is that the alleged conspiracy was knowingly formed and that two or more persons, including one or more of the defendants on trial now, knowingly became members of the conspiracy charged in the indictment.
In arriving at your decision in this case, you must determine both whether there is a conspiracy as charged in the indictment and whether any of the defendants were members of that conspiracy (N.T. p. 1449).
Now, before you may find any defendant guilty, the Government must prove *662 beyond a reasonable doubt that a particular defendant was a member of the single conspiracy charged in the indictment, that is a conspiracy to allocate customers or rig bids or fix prices on motopaving work in the counties of Lebanon, Dauphin, Cumberland and Perry during the period from at least 1967 through at least September 1977 (N.T. p. 1453).
Defendants now on trial are entitled to a trial on the merits based on the evidence and the law of this case. What you should consider here is the charge as it is contained in the indictment against the defendants now on trial...
Thus, if you should find beyond a reasonable doubt from the evidence in the case that the conspiracy charged in the indictment was knowingly formed and that the defendants or any of them knowingly became members of the conspiracy as charged, then the fact that a defendant may have believed in good faith that what was being done was not unlawful would not be a defense (N.T. p. 1456).
If it appears beyond a reasonable doubt that the evidence in the case, that the conspiracy alleged in the indictment was knowingly formed, that the accused knowingly became a member or members of the conspiracy, either at the beginning of the plan or scheme or thereafter, then the success or failure of this conspiracy to accomplish its common object or purpose in whole or in part is immaterial.
. . . . .
I caution you that you are here to determine the guilt or innocence of the accused and [sic] the evidence in this case. The defendants are not on trial for any act or conduct or offense not alleged in the indictment (N.T. 1466-67).
In addition to the preceding instructions given by the court at the close of trial, during its deliberations the jury requested a re-explanation of the definition of conspiracy. After the court reread its entire charge as to conspiracy it was brought to the court's attention that it had omitted a paragraph in the re-explanation of the charge. The court continued with this statement:
THE COURT: Ladies and gentlemen of the jury, there is one additional item that I omitted in reviewing the notes. That is before you may find any Defendant guilty, the government must prove beyond a reasonable doubt that the Defendant was a member of the single conspiracy charged in the indictment. That is a conspiracy to allocate customers or rig bids or fix prices on motopaving work in the counties of Lebanon, Dauphin, Cumberland and Perry during the period from at least 1967 to at least September of 1977.
You may now return.
Transcript of Proceedings of Jury Trial  Jury Questions and Verdict, pp. 14-15.
Supplemental charges must be considered as an addition to the original instructions and not as an independent charge. U.S. v. Blevins, 555 F.2d 1236, 1239 (5th Cir.1977), cert. denied, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978).
The court's instructions when viewed as a whole sufficiently defined for the jury the Government's burden with respect to proving a single, continuing conspiracy as charged in the indictment.[6]

IV. Admissability of Donald Snyder Statement
Defendants contend that the court erred in admitting the testimony of F. Murray Bryan concerning a statement made in his presence by Donald F. Snyder. The court permitted the testimony pursuant to Rule 804(b)(3) of the Federal Rules of Evidence.
Rule 804(b)(3) states in pertinent part:
Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
. . . . .
(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary *663 or proprietary interest, or so far tended to subject him to civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true.
In U.S. v. Palumbo, 639 F.2d 123 (3d Cir.) cert. denied, 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981), Judge Adams in a concurring opinion set out a three prong test for the admissibility of inculpatory declarations against interest:
[T]he statement is receivable only if (1) the declarant is unavailable as a witness; (2) the statement is so far contrary to the declarant's pecuniary, proprietary or penal interest that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the trustworthiness of the statement is corroborated by the attendant circumstances. Id. at 131.
This court will apply the three prong analysis to the facts of this case.[7]
There is no question as to Donald Snyder's unavailability. Mr. Snyder died in 1980. In determining whether the statements made by Donald Snyder on September 20, 1979 were against his interest, the court held a voir dire examination of Snyder's attorney, James K. Thomas, II, who was present at the time Snyder made the statement in the presence of F. Murray Bryan. Thomas testified that he was personally retained by Snyder after Snyder received a deposition subpoena to testify in connection with a civil antitrust suit.[8] Snyder told Thomas that he had participated with other people in setting prices for FB-1 paving work (motopaving). Thomas recognized the criminal nature of the conduct Snyder had described and advised him of the potential consequences of testifying at the deposition. He then advised Snyder as to his options, including the availability of his fifth amendment privilege not to testify. According to Thomas, Snyder decided he could not, in good conscience, assert the fifth amendment and if called to testify, would have to testify as to what occurred. Snyder, with Thomas' advice, then decided to attempt to meet informally with the civil defense counsel (N.T. pp. 546-47).
Snyder, accompanied by Thomas, subsequently met with civil defense counsel, including F. Murray Bryan, on September 20, 1979, at which time he gave the statement at issue. Snyder gave his statement with the understanding that he would not be subpoenaed by civil defense counsel to give deposition testimony and that he reserved the right to assert his fifth amendment privilege at trial if he desired to do so (N.T. pp. 548-49). Bryan testified that defense counsel also agreed to try to keep Snyder from involvement in the civil suit, and that they would not file a counterclaim against him in that civil suit or bring a separate suit against him (N.T. p. 576). Thomas and Bryan both testified that defense counsel specifically reserved the right to subpoena Snyder to testify at the civil trial (N.T. pp. 549, 576-77).
Defendants contend that Snyder's statement fails to satisfy the against-interest portion of the test set out above. They point to that part of the agreement reached by Snyder and the civil defense lawyers in which the latter agreed not to bring suit against Snyder through either a counterclaim or a separate suit. Defendants allege Snyder's statements sought to curry favor with the civil defense attorneys to avoid civil liability and thus were made in his pecuniary interest. The court disagrees. The Snyder statements are on their face admissions of direct participation in a criminal conspiracy and therefore are statements against his penal interest. Even though the civil defendants agreed to keep Snyder as *664 far away from the civil suit as possible, they reserved the right to call him as a witness at the trial. Snyder knew that the information he would give to Mr. Bryan would make it inevitable that he would be called as a witness if the civil suit went to trial. Snyder had already decided in the presence of his attorney, Mr. Thomas, that if called as a witness at trial he would have to testify as to what occurred. This decision was made before he met with Mr. Bryan and thus before Snyder could have known that the civil defendants would forego bringing suit against him in exchange for his voluntarily meeting with them. Furthermore, even though Snyder obtained an agreement from the civil defendants whereby the latter agreed to forego suit against him, such an agreement would still not preclude the municipalities that were victims of the motopaving conspiracy in which Snyder admitted participation from filing suit against him. Additionally, Snyder's statements would not preclude the Government from filing criminal action against him for his conspiratorial activities. Therefore, even assuming Snyder reduced some of his civil liability, his statements still tended to subject him to criminal liability as well as to other civil liability. Such statements satisfy the against-interest exception. United States v. Alvarez, 584 F.2d 694, 699 (5th Cir.1978).
Defendants cite U.S. v. L'Hoste, 640 F.2d 693 (5th Cir.1981) in support of their contentions that Snyder's statements should not have been admitted on the grounds that the statements were in, not against, his pecuniary interest. In L'Hoste, one Condon was a defendant in both a criminal and civil suit arising from the same underlying factual situation. Condon gave statements in his criminal trial which were contradicted by statements later given in his deposition for the civil trial. Defendant L'Hoste (a codefendant of Condon in the criminal case) attempted to use Condon's deposition statement in support of L'Hoste's motion for a new trial. Condon had refused to testify at a hearing on L'Hoste's motion. The trial and appellate courts denied L'Hoste the right to use Condon's civil deposition on the grounds the statements, while against Condon's penal interest, were in his pecuniary interest. The circumstances of L'Hoste are quite different from the case at bar. In L'Hoste, Condon was a party to a criminal and civil suit and his statements were clearly in his pecuniary interest. Here, Snyder was not, at the time of his statement, a party to any suit. Furthermore, Condon had given two contradictory statements and therefore his unreliability was clear. Here, Snyder did not give contradictory statements. Most importantly, the L'Hoste court set forth no corroborating circumstances that indicated the reliability of Condon's statements. As extensively discussed below, there are circumstances corroborating Snyder's statement.
Defendants contend that Snyder's statement fails to meet the third test set by Judge Adams. Specifically, defendants argue that the circumstances surrounding the making of Snyder's statement, demonstrate its unreliability.[9] Defendants basically argue that Snyder's statements are unreliable because he sought to curry favor with certain parties to avoid civil liability. They also argue that because of his personal animosity toward the Rimmers he had a chance to get even with old enemies and even up the score (Doc't. # 86, p. 37). In sum, defendants allege Snyder was motivated to fabricate his story.
*665 Under 804(b)(3), trustworthiness, which comprises the third test set out in Judge Adams' concurring opinion, is determined primarily by analyzing two elements: the probable veracity of the in-court witness and the reliability of the out-of-court declarant. United States v. Alvarez, 584 F.2d at 701. Defendants do not question the veracity of F. Murray Bryan. With regard to the second element, the court finds that the circumstances cited by the defendants do not render Snyder's statement unreliable. The court does not find the statement unreliable solely because it was given in an informal setting. Knowing that a truthful statement would expose him to criminal liability, it was quite natural for Snyder to want to reduce his exposure. Although giving the statement informally may have created less chance that his admission would become public than if he had testified at the deposition, it still created substantial criminal exposure.
Defendants assert that since Snyder retained his right not to testify at trial, his statement is unreliable. The court disagrees. This aspect of the agreement was illusory since no one could deprive Snyder of his constitutional right to remain silent. Anytime a statement against interest is introduced at trial, the declarant could assert his privilege not to testify were he called as a witness. Furthermore, civil defendants specifically retained the right to call Snyder as a witness at the civil trial, and Thomas testified that "[Snyder] decided he could not, in good conscience, take the Fifth Amendment and if called to testify, would have to testify as to what occurred" (N.T. p. 547).
Defendants compare the circumstances confronting Snyder with those of an individual in custody of legal authorities. They also claim that Snyder was in the same predicament as a co-conspirator in U.S. v. Gonzalez, 559 F.2d 1271 (5th Cir.1977). Under the circumstances, both of these comparisons are inapposite. A custodial statement is generally made after the declarant has already been charged with a crime, or must feel that such charges are likely forthcoming. See Palumbo, supra. The declarant is therefore likely to believe the authorities already have evidence of his unlawful conduct. In his own mind, therefore, he may believe that he has little to lose by admitting liability, and that he can minimize the consequences of his misdeeds by currying favor with the authorities by implicating others.
Snyder was not confronted with such a situation. Although the prospect of his being sued by civil defendants was slim, he knew he had much to lose by making his statement. His statement subjected him not only to criminal liability, but also to civil liability to his municipal customers as discussed above. Furthermore, unlike the circumstances of a custodial statement, Snyder's statement of criminal and civil violations was not made to individuals in a position to eliminate or minimize the criminal sanctions or treble damage exposure Snyder faced as a result of his statement.[10]
The court also finds Gonzalez inapplicable. The Gonzalez court considered whether the grand jury testimony of a previously convicted co-conspirator (Guerrero) was admissible against a criminal defendant (Gonzalez) when Guerrero refused to testify at Gonzalez' trial. The court refused to permit the use of the grand jury testimony. The court reasoned that Guerrero had been convicted and given immunity prior to making his grand jury statement and thus it was in his interest to testify. The court found that Guerrero would face civil or criminal liability only if he did not testify before the grand jury. Therefore whether *666 he told the truth or not was incidental to what would happen to him if he did not say something. 559 F.2d at 1273. This court does not consider Gonzalez applicable to the fact situation of the instant case.
Perhaps most compelling to this court in analyzing Snyder's statement under the third test is the fact that key aspects of the statement were supported by corroborating evidence. One of the key aspects of Snyder's statement was his description of the circumstances and the results of a meeting he attended with Murphy, Quigley, and Walter and Robert Rimmer in the Rimmers' motor home (known as Fat Albert) in March 1977. According to Bryan's testimony, Snyder stated that the individuals discussed township motopaving work for the upcoming season. He stated that government exhibit GX-3 was a product of that meeting, that it was in Murphy's handwriting, and that it memorialized an allocation of townships among the defendant companies and his own. He further stated that some of the townships on the list were specifically allocated to each company, and others were allocated randomly by drawing names from a hat. He then stated that the company to which a township was assigned would not be underbid by the other two companies (N.T. pp. 586-95).
Although at trial Robert Rimmer denied much of what Snyder said about this meeting and the list, in previous sworn testimony his description of events is strikingly similar to the description presented by Snyder. Rimmer, however, did not admit that RSE carried out its part of the agreement. Rimmer testified in a deposition given on March 11, 1980 that he and Walter Rimmer met with Murphy, Quigley and Snyder in the Rimmer motor home in March 1977 and discussed the division of territory for 1977. He testified that Murphy specifically allocated certain townships to each of the companies, and that additional names were then drawn randomly from a hat. Robert Rimmer testified that he thought both he and Walter not only appeared to be interested in the hat draw, but that they actually promised Murphy that they would go along with his plan in order to learn what jobs he wanted. Deposition of D. Robert Rimmer, Vol. IV, at pp. 574-76 and 586-87, RSE, Inc. v. Pennsy Supply, Inc., 523 F.Supp. 954. (Attached as Appendix A to this opinion).
At trial Rimmer testified that he had left the motor home and upon returning found the others already drawing names from a hat. According to his trial testimony, his only knowledge as to the purpose of the name draw came from Walter, and that Walter told him it was for promotional purposes (N.T. pp. 1222-28).
Robert Rimmer's deposition and trial statements conflict irreconcilably. The court concludes that since Robert Rimmer had the incentive at the time he made both statements to disassociate himself from knowledge that the name draw was for the purpose of allocating territories, his admission at his deposition that this was indeed the purpose, and that he himself actually participated in the draw, lends substantial support to the reliability of Snyder's version of the meeting.
Further corroboration of Snyder's version of the 1977 meeting came from Al Kane's testimony that on several occasions he observed Walter Rimmer reviewing a copy of government exhibit GX-3 prior to establishing bids, (N.T. pp. 278-81) and that GX-3 was a xerox copy that Kane made of a document that Walter Rimmer kept in his desk (N.T. pp. 329-30). A handwriting expert testified that most of the handwriting on GX-3 was done by Murphy (N.T. pp. 24-41).
Finally, examination of the 1977 bid results for municipalities listed on GX-3 reveals that no company under whose name a municipality was listed was ever underbid at that municipality by the other companies represented at the March 1977 meeting (N.T. pp. 696-705). This provides additional corroborating evidence of Snyder's statement.
Other aspects of Snyder's statement are also corroborated by independent evidence. Snyder stated that there had been a prior allocation list similar to GX-3 (N.T. p. 602). Kane testified that in 1976 he had seen *667 Walter Rimmer review such a list when bidding (N.T. p. 281). Snyder stated that he, Murphy, Quigley, and the Rimmers had met, he believed in 1975, at RSE's new office building, and discussed bids and prices of motopaving (N.T. pp. 586, 596-97). Kane testified that he saw Murphy and Snyder with the Rimmers at RSE's new building in the winter of 1976, and thought that he heard them talking to a fifth unseen individual (N.T. pp. 276-77, 310). Charlotte Walters testified that she saw the Rimmers with Murphy, Snyder and a fifth individual whom she did not know at RSE's new building in the spring of 1976 (N.T. p. 339). Although each individual dated the meeting differently, the conflict is not substantial. Furthermore, Snyder's statement that a conspiracy existed was also corroborated by the testimony of Charles Witmer (N.T. pp. 158-166, 233-33) and Ward Wilson (N.T. pp. 68-83). The court concludes that Snyder's statements met the tests of Rule 804(b)(3).
Defendants also contend that Snyder's statements were inadmissible on the grounds they violated defendants' right of confrontation guaranteed by the sixth amendment. They cite Bruton v. U.S., 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1972), among other cases. Defendants H & M, Inc., and Quigley argue that Rule 804(b)(3) should be interpreted to preclude admission of Snyder's statement based upon the legislative history of the Rule, which is set forth below. These defendants contend that admitting Snyder's statement under Rule 804(b)(3) would effectively overrule Bruton. This court disagrees.
The legislative history of the Rule was aptly described by Judge Adams in his concurrence in Palumbo:
As originally drafted by the Advisory Committee, Rule 804(b)(3) precluded the admission of inculpatory statements. The final sentence of the draft rule provided: "This [exception] does not include a statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused." Proposed Fed.R.Evid. 804(b)(4) (1969 draft), 46 F.R.D. 161, 378 (1969) (later renumbered as Fed.R.Evid. 804(b)(3)). While this sentence had been deleted by the time the Supreme Court promulgated the official Advisory Committee Draft of the Federal Rules of Evidence in 1972, see 56 F.R.D. 183, 321 (1972), the House of Representatives reinserted the exclusion of inculpatory statements, see House Committee on the Judiciary, Report on Federal Rules of Evidence, H.R.Rep. No. 93-650, 93d Cong., 1st Sess. 16 (1973), U.S.Code Cong. & Admin.News 1974, p. 7051. This restoration was of short duration, however, as the Senate rejected the House's reference to inculpatory statements, see Senate Committee on the Judiciary, Report on Federal Rules of Evidence, S.Rep. No. 93-1277, 93d Cong., 2d Sess. 21-22 (1974), and it was the Senate's position which was adopted by the conference committee, see Committee on Conference, Report on Federal Rules of Evidence, H.R.Rep. No. 93-1597, 93d Cong., 2d Sess. 12 (1974)...
Ultimate rejection of the sentence forbidding admission of inculpatory declarations against interest might suggest a Congressional intent that such declarations should be admitted when the requirements of Rule 804(b)(3) are satisfied. But the reasons for the Senate's omission of the sentence cast some doubt on such a spacious interpretation...
. . . . .
The dispute between the Senate and the House ... arose from differing judgments concerning the propriety of codifying evolving evidentiary principles based on constitutional considerations. Congress decided ultimately that limitations on admissibility mandated by the Confrontation Clause should be left to the courts to propound and refine. There is no indication, however, of a clash of opinion within the Congress about whether traditional justifications for hearsay exceptions apply to inculpatory declarations *668 against interest. Significantly, no Congressional committee suggested that inculpatory declarations are insufficiently reliable to be included within the Rule 804(b)(3) exception. The legislative history suggests, if anything, the contrary, for if either House had entertained such an opinion, it would have had no need to address the Bruton question; unreliability is an adequate  indeed, the historical  reason for treating hearsay statements as inadmissible. (footnote omitted) 639 F.2d at p. 130 (Adams, J. concurring).
Judge Adams concluded that the history of the Rule was not inconsistent with a construction allowing the admission of declarations against interest that inculpated the accused, provided such admission did not abridge the sixth amendment's Confrontation Clause. Judge Adams then referred to, among other cases, Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1979) to determine the requirements of the Confrontation Clause.
In Ohio v. Roberts, the Court allowed the introduction into evidence of testimony given at a preliminary hearing by a witness who was not present at the subsequent state criminal trial. In its opinion the Court summarized the limitation imposed by the Confrontation Clause onto exceptions to the hearsay rule. The Court recognized that if the Confrontation Clause of the sixth amendment were read literally, "it would require, on objection, the exclusion of any statement made by a declarant not present at trial ... if thus applied, the Clause would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." 448 U.S. at 63, 100 S.Ct. at 2537.
Justice Blackmun, speaking for the majority, noted that although the Confrontation Clause reflects a preference for face-to-face confrontation at trial,
The Court, however, has recognized that competing interests, if "closely examined," Chambers v. Mississippi, 410 U.S., at 295, [93 S.Ct., at 1045], may warrant dispensing with confrontation at trial. See Mattox v. United States, 156 U.S. [237] at 243 [15 S.Ct. 337 at 340, 39 L.Ed. 409 (1895)] ("general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case"). Significantly, every jurisdiction has a strong interest in effective law enforcement, and in the development and precise formulation of the rules of evidence applicable in criminal proceedings. See Snyder v. Massachusetts, 291 U.S. 97, 107 [54 S.Ct. 330, 333, 78 L.Ed. 674] (1934); California v. Green, 399 U.S. [149] at 171-172 [90 S.Ct. 1930 at 1941-1942, 26 L.Ed.2d 489 (1970)] (concurring opinion). 448 U.S. at 64, 100 S.Ct. at 2538.
The Court identified two hurdles that hearsay testimony must clear in order to comply with the Confrontation Clause. First, the hearsay declarant must be unavailable for cross-examination at trial. Second, the statement must bear adequate indicia of reliability. "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." 448 U.S. at 66, 100 S.Ct. at 2539.
Applying the foregoing tests, this court finds no Confrontation Clause violation from the admission of Snyder's statement. Clearly, Snyder was unavailable at trial for cross-examination due to his death. Furthermore, there were particularized guarantees of trustworthiness to ensure its reliability.[11] In addition to the factors previously set forth on this issue, the court points to *669 the fact that individuals who corroborated key aspects of Snyder's statement were subject to cross-examination and continued their corroboration. This lends a high degree of reliability and trustworthiness to Snyder's statement. See generally, United States v. West, 574 F.2d 1131, 1138 (4th Cir.1978). Additionally, defendants RSE, Inc. and the Rimmers had the opportunity to probe what they described as Snyder's bias, lack of personal knowledge and faulty memory by cross-examining F. Murray Bryan about Mr. Snyder's statement. These defendants, however, did not explore such matters with Mr. Bryan save one question which was repeatedly rephrased relating to Snyder's bias (N.T. pp. 621-632). The court, therefore, does not find compelling defendants' argument concerning their inability to probe key weaknesses in Snyder's statement.
The court finds one further indication of the reliability of Mr. Snyder's statement. The court finds, based upon Mr. Bryan's testimony, that the questioning of Mr. Snyder by civil defense counsel "partook of cross-examination as a matter of form." Ohio v. Roberts, 448 U.S. at 70, 100 S.Ct. at 2541. The questions were leading, demanded detailed knowledge and probed for the basis of Snyder's knowledge. Furthermore, since the civil defense attorneys questioning Mr. Snyder were interested in obtaining information which would prove helpful to their clients in defending or settling the civil case, the attorneys were pressing for accurate information. Undoubtedly, their questioning was not akin to direct examination. The form of questioning, therefore, adds further guarantees of reliability to Mr. Snyder's statement.
For all of the foregoing reasons, the court concludes that Snyder's statement satisfies the Confrontation Clause tests set forth in Ohio v. Roberts.[12]
The foregoing analysis is not changed by the Bruton decision. The Bruton Court indicated in footnote 3 of the opinion that it was not abrogating hearsay exceptions:
We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under the traditional rules of evidence ..., the problem arising only because the statement was ... admissible against the declarant Evans.... There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause. (citations omitted) U.S. v. Bruton, 391 U.S. at 128, n. 3, 88 S.Ct. at 1623, n. 3.

V. Admission of Co-Conspirator Statements
Defendants RSE, Inc. and Walter and Robert Rimmer allege that the court breached its obligation under U.S. v. Trowery, 542 F.2d 623 (3d Cir.1976), cert. denied, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 *670 (1977), when, pursuant to Federal Rule of Evidence 801(d)(2)(E), it admitted various statements against all defendants as statements of co-conspirators.
To determine whether statements of an alleged co-conspirator are competent against the nondeclarant, the trial judge must make two findings. First, the court must decide whether the government has proved, by a clear preponderance of the evidence, independent of the hearsay statement, that a joint undertaking existed at the time of the statement or action. Secondly, it must decide whether the prosecution has proved participation in the conspiracy by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances. U.S. v. Trowery, 542 F.2d at 627, U.S. v. Bey, 437 F.2d 188, 191 (3d Cir.1971).
The defendant against whom the statement is used need not be a member of the conspiracy at the time of the declaration. As long as the conspiracy and defendants' participation in it are established by a preponderance of independent evidence, then declarations and acts of various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all co-conspirators. U.S. v. Gypsum Co., 333 U.S. 364, 393, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1947).
The specific evidence cited by the court to show the existence of a conspiracy and each defendants' participation therein, appears at pages 767-769 of the record. The evidence in the record and that cited by the court clearly establish by a preponderance of the independent evidence the joint undertaking and defendants' participation.[13]
Defendants contend that the court should have expressed its view on the credibility of the evidence considered. In U.S. v. Continental Group, Inc., 603 F.2d at 457, the court stated: "There is no requirement in either of those opinions (Trowery or Bey) that the trial judge enter specific findings of fact supporting his conclusion that a clear preponderance of independent evidence has been presented establishing a conspiratorial relationship between the hearsay declarant and each of the defendants." The court at p. 459 did indicate that such exposition might be the better method. Thus, if specific findings are not required to show the joint undertaking, it would be an anomaly, as the Government contends, to require the trial court to make specific findings as to credibility.

VI. Severance
Defendants H & M, Inc. and Quigley contend that the court erred in refusing to grant the motion for severance. Defendants contend that they were unable to refute *671 the "highly prejudicial" testimony of the Rimmers because the former could not cross-examine the Rimmers. Defendants claim they would have had to implicate themselves in another separate conspiracy in order to cross-examine the Rimmers effectively.[14] Specifically, defendants claim that in order to impeach the Rimmers they would have had to bring out on cross-examination that the Rimmers had filed a law suit against H & M, Inc. and Quigley alleging that the latter were conspiring to drive the Rimmers out of business. While H & M, Inc. and Quigley acknowledge that this information could be used to show that the Rimmers were biased and therefore that their testimony was not credible, defendants allege a serious problem could arise in bringing out this material. They contend that the same material would have been damaging to them because it would have brought to the jury's attention the possible involvement of H & M, Inc. and Quigley in another conspiracy. Hence they would have had to defend against two conspiracies.
The courts have articulated the grounds upon which a severance may be granted. Separate trials are required when co-defendants present defenses that are so irreconcilable as to be mutually exclusive. United States v. Provenzano, 688 F.2d 194, 198 (3d Cir.1982). Separate trials are not required, however, when co-defendants merely have inconsistent interests and may present antagonistic defenses. United States v. Addonizio, 451 F.2d 49, 62-63 (3d Cir.1971), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). Furthermore, a defendant is not entitled to a severance simply because a co-defendant takes the stand and implicates the former in a crime in which they both are charged. Madden v. Israel, 478 F.Supp. 1234, 1243 (E.D.Wis. 1979).
Separate trials may also be required when the actual conduct of a co-defendants' defense prejudices the defendant. United States v. Ziperstein, 601 F.2d 281 (7th Cir.1979). This ground for reversal requires a careful evaluation of the facts elicited, prejudicial tendencies and the entire course of the trial prior to the challenged conduct. Id., at 286. The court concludes that defendants have failed to establish grounds for a severance.
Defendants were given every opportunity to cross-examine the Rimmers and thus to place on the record questions and answers so that the court could evaluate the prejudice to defendants arising from the Rimmers' testimony. Defendants declined to cross-examine the Rimmers (N.T. p. 1169). Furthermore, the defendants did not request an in camera hearing on the cross-examination of the Rimmers. Defendants' fears of ineffective or prejudicial cross-examination were speculative until such time as the actual testimony was heard. If defendants' fears proved to be well founded this court could have severed the trial after the cross-examination of the Rimmers. Defendants must demonstrate that a joint trial would result in "the most compelling prejudice" in order for severance to be granted. U.S. v. Campbell Hardware, Inc., 470 F.Supp. 430, 437 (D.Mass. 1979), aff'd. on other grounds sub. nom., U.S. v. David E. Thompson, Inc., 621 F.2d 1147 (1st Cir.1980). Defendants have failed to demonstrate that kind of prejudice.
Defendants contend that if they had been granted separate trials from the Rimmers, the Rimmers likely would not have testified. This is speculative at most. Nothing is offered in support of this contention other than the speculation that the Rimmers would exercise their right to remain silent. The likelihood of this happening would be contrary to the history of the case to date. The Rimmers appeared before the grand jury and testified. The Rimmers testified on their own behalf at this trial. Whether or not the Government would call the Rimmers as witnesses in a separate trial and if called whether they would testify is speculative. *672 This court, however, cannot ignore the Government's right to compel their testimony pursuant to Title 18 U.S.C. § 6002.
Defendants also allege prejudice because the Rimmers' testimony filled in gaps in the Government's case particularly regarding the "Fat Albert meeting." The court finds no merit to this claim. By the time the Rimmers testified, considerable testimony had already been given about the conspiracy including the Fat Albert meeting. While the Rimmers corroborated the Government's case, no new testimony bolstering the Government's case was given. In such circumstances, no prejudice exists. Ziperstein, 601 F.2d at 288.

VII. Government's Closing Argument
All defendants contend that certain statements in Government counsel's closing address constituted prejudicial error. The first statement complained of is underlined and appears below in context:
Let's look at the testimony when you consider who should be believed and who should not be believed. They said Bud Witmer is incredible. Have they once during the summations and during the testimony pointed out where Bud Witmer's story is inconsistent with anybody's else's? They haven't, not once. Why do they tell you he is incredible? Because he has got bills, because he went to American Paving shortly after he left RSE, and for these reasons, he is a bad man and shouldn't be believed. Well, he is a bad man. I am not going to tell you that he is not. He is a conspirator, pure and simple. He violated the law from 1970 to '73. He was as guilty as these gentlemen sitting in the courtroom. I am not going to tell you he is a pillar of the community. But is his story consistent with what else was said in this case? I submit that it is (N.T. pp. 1415-16).
Defendants contend that the underlined portion denied them a fair trial because Government counsel improperly injected personal belief concerning the guilt of defendants.
The Third Circuit has set forth rules governing when reversal is required for prosecutorial misconduct. In U.S. v. LeFevre, 483 F.2d 477, 478-79 (3d Cir.1973) the court adopted Standard 5.8(b) of the American Bar Association's Prosecution Standards as the law governing practice in the district courts of this Circuit. That standard provides:
It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence of the guilt of the defendant. Standards Relating to the Prosecution Function and the Defense Function 39 (1971).
In U.S. v. Gallagher, 576 F.2d 1028, 1042 (3d Cir.1978), cert. denied, 443 U.S. 1040, 100 S.Ct. 713, 62 L.Ed.2d 675 (1980), the court distinguished between prosecutorial remarks regarding the defendant's guilt or a witness' credibility that are based on the evidence and those that are based on information outside the record. The court held,
... that before reversal is warranted, based on the prosecutor's statements alone, those statements must be based on information not before the court. If the statements are based on evidence, prejudice must be shown to result to the defendant before reversal is warranted. Such prejudice can be cured by an appropriate instruction by the trial judge or by a finding that there is overwhelming evidence to support the conviction. (Emphasis added)
See also, U.S. v. Swinehart, 617 F.2d 336, 339-340 (3d Cir.1980).
In U.S. v. Scarfo, 685 F.2d 842, 849 (3d Cir.) cert. denied, ___ U.S. ___, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1982) the court stated:
In considering a defendant's contention that a prosecutor's remarks in summation were improper, it is important to keep in mind that the appropriate inquiry is whether such remarks, in the context of the entire trial, were sufficiently prejudicial to violate defendants' due process rights ... the focus must be upon the fairness of the trial.
*673 Under the principles delineated by the Third Circuit, the prosecutor's comment regarding the defendants' guilt in this case does not warrant the granting of a new trial. Government counsel's statement, viewed in its full context, is based squarely on evidence adduced at trial and, therefore, does not constitute reversible error per se. As set forth in Section VIII of this opinion, the evidence in the record clearly shows that a conspiracy to rig bids, fix prices and allocate customers on motopaving projects existed, that Charles "Bud" Witmer was an active participant in that conspiracy (N.T. pp. 158-166) and that Witmer's conspiratorial activities were always carried out on behalf of RSE, Inc. with the express sanction and approval of Donald C. Rimmer, the company president (N.T. pp. 231-33).
RSE, Inc. and the Rimmers contend that Government counsel's comment was based on information outside the record because it invited the jury to infer that Witmer had already been convicted of the charge against the defendants. The court disagrees. Government counsel's comment was the result of a lengthy attack on Witmer's credibility launched by defense counsel during closing argument (N.T. pp. 1342-48). Furthermore, Government counsel prefaced his remarks about Witmer by asking the jury to remember the testimony in the case before they decided whom to believe (N.T. pp. 1415-16). Taken in context, it is clear that counsel's remarks were an invitation to the jury to recall testimony of record wherein Witmer himself admitted being a co-conspirator and violating the law.
Since the prosecutorial statement was based on the record, Gallagher requires defendants to show prejudice before a reversal is granted. 576 F.2d at 1042. That case also stated that prejudice could be overcome by overwhelming evidence of guilt. The record contains ample proof of the Rimmers' involvement in a conspiracy. Furthermore, in viewing the trial as a whole, it cannot be said that the defendants were prejudiced.
In the event that any prejudice did occur, such prejudice can also be cured under Gallagher[15] by appropriate instructions by the court. In this case the court charged that (1) the prosecution bears the burden of proof in a criminal case (N.T. p. 1441); (2) that such proof must convince the jury beyond a reasonable doubt (N.T. p. 1441); (3) that jurors are the sole judges of the credibility of the witnesses (N.T. p. 1431); (4) statements and arguments of counsel are not evidence unless made as an admission or stipulation (N.T. p. 1434); and (5) with regard to statements of law governing the case, that must come from the court (N.T. pp. 1429, 1435).
Specifically addressing itself to arguments of counsel the court charged:
In line with this particular instruction, ladies and gentlemen of the jury, as I said, counsel is (sic) permitted to suggest inferences and deductions. However, the Government is not permitted to express the (sic) personal opinion as to the guilt of any defendant or defendants in a criminal case. They may only make suggestions or inferences that you may deduct from the evidence presented (N.T. pp. 1435-36).
The charge was sufficient to cure any possible prejudice caused by the prosecutor's comment.
Defendants RSE, Inc. and the Rimmers also allege prejudice from other rebuttal remarks of Government counsel. None of these comments were objected to at the time of trial and therefore must constitute plain error before a new trial will be granted. U.S. v. Gross, 511 F.2d 910, 919 (3d Cir.), cert. denied, 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975). The absence of an objection to the prosecutor's remarks "weighs heavily in the determination that they were not actually prejudicial." United States v. Odom, 348 F.Supp. 889, 894 (M.D. *674 Pa.1972), aff'd mem., 475 F.2d 1397 (3d Cir.), cert. denied, 414 U.S. 836, 94 S.Ct. 182, 38 L.Ed.2d 72 (1973). Furthermore, prosecutorial statements which refer to an individual belief in defendant's guilt based on the evidence are not considered so prejudicial as to constitute plain error. United States v. Odom, 348 F.Supp. at 894. Of the foregoing principles, the court finds the Odom principle particularly applicable. Defense counsel could easily have objected to the alleged additional instances of prosecutorial misconduct as they occurred. Defendants, however, have waited to read the rebuttal argument and group the statements together on paper. As set forth below, the court finds that even presented in this manner defendants have failed in their effort to show the necessary prejudice to merit a new trial.
The first statement challenged by defendants is as follows:
I don't know about you, ladies and gentlemen, but when someone tells me everyone else but me is [not] [sic] telling the truth, I am skeptical (N.T. p. 1415).
Defendants, however, omitted the preceding sentences where Government counsel invited the jury to re-examine defense counsel's closing argument, particularly those portions suggesting that all of the Government witnesses had lied. Defendants also left out the next sentence following the one in issue where counsel said, "Let's look at the testimony when you consider who should be believed and who should not be believed" (N.T. pp. 1415-16). Quite rationally, one can argue that Government counsel's statement merely points out to the jury what defense counsel attempted to do during their arguments, and that the jurors should look at the testimony in the case when they determine credibility. Even assuming without deciding that the comment was inappropriate, no plain error occurred in light of the evidence of guilt and the court's explicit jury instructions.
Defendants next challenge a statement made by counsel regarding Donald Snyder. The passage cited is:
Why would Snyder lie and implicate himself in the very crime that these men sit here charged with? I submit to you, ladies and gentlemen, that is incredible that he would do that (N.T. pp. 1416-17).
Again, defendants have omitted the full context of the statement. Immediately preceding the remarks cited, Government counsel summarized the various facts which, according to defendants, tended to show that Snyder had fabricated his story. Government counsel then asked the jurors to consider whether Snyder would lie about the criminal acts of others while simultaneously implicating himself in the same acts. Counsel's argument was based on matters of record. Therefore if any error occurred it must be prejudicial and constitute plain error. Assuming without determining if the remark was improper, the court finds insufficient basis to grant a new trial for the reasons set forth immediately above.
The next two passages that defendants now object to can be considered together. The underlined portions, constituting the objections are as follows:
Let's look at the Rimmers and see what they said. Ladies and gentlemen, I suggest that the Rimmers have done something in this case which I think is reprehensible. They have blamed the entire conspiracy on the other defendants in an attempt to save their own skins. They have admitted everything short of the agreement, but once they get to the agreement, they back off....
I submit to you, ladies and gentlemen, that the Rimmers have testified to what they thought was convenient at the time. Their stories are inconsistent with what they have said before, and they are nothing but fabrications, pure and simple (N.T. p. 1419).
As with the other passages cited by defendants, these statements were pulled out of context. Immediately following the above remarks, counsel said, "Let's look at some of the things they (the Rimmers) said" (N.T. p. 1420). Government counsel then detailed for the jury the inconsistent statements *675 made by Walter Rimmer regarding the Hampden Township bid letting, what individual at RSE had authority to bid work, the December 6, 1976 meeting at which Tim Nicholas was present, and RSE's reasons for not submitting bids to certain townships in 1977 (N.T. pp. 1420-22). All of the statements referred to were matters of record for argument. While it was entirely proper for counsel to juxtapose statements in evidence which he thought to be inconsistent, it is arguable that counsel should have omitted characterization of the trial testimony of defendants as "reprehensible" and as "fabrications." Even assuming without deciding that error occurred, the court fails to find plain error in the comments in light of the court's jury instruction and the evidence of guilt.
Defendants also object to the following remarks:
I submit, ladies and gentlemen, that that is what he did throughout his direct examination. He has been saying what is convenient (N.T. p. 1422).
This comment came immediately after Government counsel detailed the various inconsistent statements made by defendant Walter Rimmer. The court feels counsel's statement was merely an attempt to highlight the inconsistent nature of Walter Rimmer's statements and to allude to the fact that Rimmer may have had some incentive to give different testimony at trial. No error occurred, and even if it did, it was not plain error as discussed above.
Finally, defendants object to two remarks made by Government counsel during his discussion of defendant D. Robert Rimmer. The contested statements are underlined as they appeared in full context:
Bob Rimmer is no better. He also admits everything up to the agreement because it is convenient for him to do so. He said unequivocally during his direct examination, "I never promised Murphy that I would go along with him." He also said, "I never tried to lull Murphy into a false sense of security." He said those very things in depositions prior to the civil case, and that was brought out in his cross-examination. Why didn't he say it in the trial? Because it was too inconvenient for him to do so (N.T. p. 1422).
Again, Government counsel referred specifically to testimony in the record. As he had done with Walter Rimmer, counsel was merely highlighting the inconsistent testimony of Robert Rimmer and suggesting to the jury that Robert Rimmer may have had something to gain by cutting back on prior testimony. The challenged statements were firmly based on testimony given at trial. The court sees no need to decide if the comments were inappropriate since, even assuming their inappropriateness, no plain error occurred.
The court rejects the contention of defendants RSE, Inc. and the Rimmers that the above statements impermissibly shifted to them the burden of proving lack of agreement. The court also rejects the same defendants' suggestion that the above statements were made "in heated, passionate outburst" (Defendants' brief p. 52). This does not properly characterize the tone and manner in which the statements were made.

VIII. Motions for Judgments of Acquittal
All defendants have moved for judgments of acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure claiming there was insufficient evidence to support the verdict. They have also moved for a new trial under Rule 33 alleging the verdict was contrary to the weight of the evidence.
The standard for review of a motion under Rule 29(c) is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
In order to establish the defendants'[16] guilt, the Government had to prove beyond *676 a reasonable doubt (1) the existence of a conspiracy to allocate customers, rig bids and fix prices on motopaving projects in the four-county area set forth in the indictment; (2) the conspiracy was in restraint of interstate trade or commerce; (3) the restraint was unreasonable. Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913); United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). With regard to the conspiracy, the Government had to prove that it was knowingly formed and that two or more persons, including one or more of the defendants, were knowing members of the charged conspiracy. United States v. Continental Group, Inc., 603 F.2d at 462.
To prove the existence of the conspiracy, the Government need only show that an agreement to allocate customers, rig bids and fix prices was made; no overt act need be shown. Nash, 229 U.S. at 378, 33 S.Ct. at 782. The agreement need not be express or formal; it may be implied from a course of dealing or other circumstances, such as the conduct of the parties. Frey & Son, Inc. v. Cudahy Packing Co., 256 U.S. 208, 210, 41 S.Ct. 451, 65 L.Ed. 892 (1921).
In evaluating defendants' motions for new trials under Rule 33, the court is to weigh the evidence produced by the parties, assess the credibility of the witnesses and decide if the verdicts were contrary to the weight of the evidence, bearing in mind that such a motion should be granted only where the evidence preponderates heavily against the verdict. United States v. Pepe, 209 F.Supp. 592, 595 (D.Del.1962), aff'd. per curiam, 339 F.2d 264 (3d Cir.1964).
With these principles in mind, the court will review the contentions of the defendants.

A. Evidence as to William H. Quigley, Jr.
Defendant Quigley contends that there is insufficient evidence in the record to support a determination that he participated in the conspiracy. He also contends that there is insufficient evidence that he authorized H & M's participation in the conspiracy to justify holding him responsible for its conduct.[17] The court finds sufficient evidence exists to support Quigley's conviction for both his direct participation and his authorization of the conspiracy.
Quigley was implicated as a member of the conspiracy as early as 1967 when, according to Don Snyder, Quigley and Murphy met Donald Rimmer, President of RSE, Inc., early in the bidding season. This was RSE's first year in competition with H & M, and prices for motopaving work had been falling due to vigorous competition between the two companies. Following the meeting among Quigley, Murphy, and Rimmer, Rimmer asked Snyder to prepare a list and mark the townships in terms of the amount of FB-1 material that was usually put down by the townships. Rimmer also asked Snyder to choose the townships Snyder wanted most. RSE subsequently won those townships which Snyder had designated *677 (N.T. pp. 582-84). Viewed in conjunction with the evidence relating to the later existence of the conspiracy, it is reasonable to infer that the meeting among Quigley, Murphy, and Rimmer was in connection with the conspiracy.
Further direct evidence of Quigley's participation in the conspiracy came from Ward Wilson's testimony. Wilson testified that in March 1972 Murphy called Wilson to arrange a meeting at Wilson's home. On the day of the scheduled meeting, Quigley appeared at Wilson's home and explained he was there on behalf of the vacationing Murphy. Quigley then explained that he wanted H & M to win a large upcoming motopaving bid at East Pennsboro Township and asked Wilson to "lay off" on his bid there. In return for Wilson's compliance, Quigley told Wilson that he could see to it that Wilson Paving would win the bid at West Pennsboro Township (N.T. pp. 69-72).
Testimony by Charles Witmer established that Murphy and H & M were members of the conspiracy at the time Quigley substituted for Murphy and made his proposition to Wilson (N.T. pp. 163-65). Since Quigley was able to substitute for Murphy in the latter's meeting with Wilson, a rational trier of fact could conclude that Quigley not only participated in the conspiracy himself but also knew of Murphy's participation in efforts to allocate townships as well.
Testimony from Murray Bryan relating statements of Donald Snyder established that Quigley met with Murphy, Snyder, and the Rimmers at RSE's offices in 1975 or 1976. Although Snyder believed that this meeting took place in 1975, Al Kane and Charlotte Walters both testified that Walter and Bob Rimmer met in 1976 with Murphy, Snyder, and an unidentified third individual (N.T. pp. 276-77, 339-40). Walter Rimmer himself testified that Snyder was only at RSE once since 1969 (N.T. p. 1079). It would, therefore, be reasonable for the jury to believe that the meeting Snyder referred to actually took place in 1976. Snyder stated that the individuals at this meeting discussed bids and prices for motopaving work. Snyder believed that an allocation list was produced as a result of this meeting (N.T. pp. 586, 596, 602). Robert Rimmer testified that he was "pretty sure" Quigley attended a meeting with Murphy, Snyder and Walter Rimmer at RSE in 1976 (N.T. pp. 1223-24).
Evidence also showed that Quigley attended a March 1977 meeting in the Rimmer's motor home (Fat Albert) with Murphy, Snyder and the Rimmers. At that meeting, fifty municipalities were allocated among the conspirators, as reflected in a list entitled "1977 FB-1" (N.T. pp. 586-87, 592-96). The list was shown to have been authored by Murphy (N.T. pp. 240-50). The bid results for 1977 show that for the eighteen municipalities on the list which held lettings in 1977 for motopaving projects, the low bidder among the three companies represented at the Fat Albert meeting was always the company beneath whose name the municipality was listed on the 1977 list (N.T. pp. 696-705).
Since the court found by a preponderance of evidence at the conclusion of the Government's direct case that Quigley was a participant in a joint undertaking, it is proper to consider the evidence relating to the acts and statements of other individuals similarly shown to be participants in the joint undertaking. Upon consideration of all such evidence in addition to the evidence referred to above, a reasonable jury could find beyond a reasonable doubt that Quigley was a knowing participant in the conspiracy.
Assuming, arguendo, that the evidence outlined above forms an insufficient basis to find Quigley's direct participation in the conspiracy, the court finds it would still provide a sufficient basis for a jury to find beyond a reasonable doubt that Quigley had knowledge of the conspiracy and the participation of H & M and Murphy in it and that Quigley failed to fulfill his obligation to stop such participation. As stated in United States v. Gillen, 599 F.2d 541 (3d Cir.), cert. denied, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979):

*678 When a company president has knowledge that his company is involved in a price-fixing conspiracy and takes no action to stop it, he may not insulate himself from liability by leaving the actual execution of the scheme to his subordinates ... If this were not the rule, the highest corporate officers would, in effect, be beyond the reach of the antitrust laws even when their companies are actively engaged in price fixing. 559 F.2d at 547 (citation omitted).
Quigley was an officer of H & M from at least 1971 through the end of the conspiracy. He was president from at least 1973 on, and Murphy's superior (N.T. pp. 571-72). Quigley, therefore, was obligated to put a stop to H & M and Murphy's participation in the conspiracy if he was aware of it. It appears clear that Quigley had such knowledge. Quigley substituted for Murphy at the meeting with Ward Wilson where he attempted to reach an agreement with Wilson to allocate townships which could only benefit H & M if Quigley knew H & M did not need to be concerned with the bids of its other competitors. Furthermore, it strains credulity that Quigley could have attended two conspiratorial meetings at which prices and customer allocation were discussed, including the Fat Albert meeting at which municipalities were allocated by actually drawing names from a hat, without knowing that an agreement among the competitors existed. It would be reasonable, therefore, for a jury to find beyond a reasonable doubt that Quigley did in fact know that Murphy and H & M were participating in the illegal agreement, and yet took no action to require them to withdraw.

B. Evidence as to H & M, Inc.
The evidence in support of the convictions of William H. Quigley, Jr., President of H & M supports the conviction of H & M, Inc.

C. Evidence as to Walter E. Rimmer
Defendant Walter Rimmer's motion for judgment of acquittal or, in the alternative, a new trial appears to focus on what he alleges to be the lack of credibility of Charles Witmer and Donald Snyder. Rimmer set forth the standards for this court to use in evaluating his contentions:
[T]he true rule ... is that a trial judge, in passing upon a motion for a directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. United States v. Williams, 311 F.2d 721, 723 (7th Cir.), cert. denied, 374 U.S. 812, 83 S.Ct. 1703, 10 L.Ed.2d 1035 (1973) (emphasis added) (Doc't. # 84, p. 79).
The evidence clearly supports the jury's verdict of guilty as to Rimmer.[18] Charles Witmer testified that in 1970 while he was Vice President of RSE, Walter Rimmer was present in Witmer's office when Donald Rimmer told Witmer of the allocation agreement between RSE and H & M. During the course of Donald Rimmer's explanation, Walter Rimmer retrieved a paper from his office which listed various townships in two columns, one headed by "RSE" and the other by "H & M." Walter Rimmer told Witmer that the list showed which townships had been allocated to each company (N.T. pp. 159-61).
Rimmer attempted to impeach Witmer's above cited testimony by asserting that Rimmer did not have an office in 1970 from which to retrieve the allocation list (N.T. pp. 1035-36). Rimmer, however, also testified that he did, in fact, have a desk "right around the door from [Witmer's] office" (N.T. p. 1035).[19]
*679 Witmer testified that he participated in the conspiracy until he left RSE in 1972, and that throughout the 1970, 1971 and 1972 bidding seasons, RSE communicated with Jack Murphy before bid lettings in order to convey bidding information. The company to which a township had been allocated would tell the other company the price it was going to bid, and the other would bid higher. When a township was assigned to Snyder & Sons, Snyder's bid would be relayed to RSE by Murphy.[20] Witmer testified that he generally participated on behalf of RSE in these conversations with Murphy, but that at various times when he was absent from the office Walter Rimmer would convey the information to him (N.T. pp. 161-62).
Ward Wilson corroborated Witmer's testimony as to Walter Rimmer's participation in the conspiracy in 1972. Wilson testified that Rimmer called him immediately prior to a bid letting at Monroe Township to arrange a meeting at Wilson's office. At the meeting, Rimmer told Wilson that he wanted to win the Monroe bid at a good price and that he wanted Wilson Paving to bid high to enable RSE to win. He gave Wilson two legal notices for bid lettings at other townships and told Wilson he would arrange for Wilson Paving to win those bids if Wilson would agree to Rimmer's request on the Monroe bid (N.T. pp. 78-83).
In his defense, Walter Rimmer gave his own version of his conversation with Wilson. Rimmer testified:
I asked him if he was going to bid Monroe Township. I told him it was coming up. He said that he didn't know if he was going to bid it. I told him that I had been promoting the use of it, of FB-1 in Monroe Township. I suggested that he put in a bid for Monroe Township and he said, don't you want Monroe Township? And I said, I would like to be low bidder there, that I lived in that township, but I certainly didn't mind if he bid it. That was the name of the game (N.T. pp. 1044-45).
Through this testimony, Rimmer attempted to convince the jury that Wilson simply misinterpreted his remarks in 1972. Wilson's testimony, however cannot be reconciled with Rimmer's in one important respect: Rimmer failed to account for his offer to arrange for Wilson Paving to win two other bids. It is noteworthy that Rimmer not only failed to explain Wilson's testimony regarding that offer, but failed even to deny it.
The record also includes testimony that Rimmer participated in the conspiratorial meeting at RSE's office (N.T. pp. 586, 596-97). Testimony also established that an allocation list was probably prepared after this meeting (N.T. pp. 602-603) and that Rimmer was thereafter observed referring to a paper while formulating township bids (N.T. p. 281).
Both Walter and Bob Rimmer attempted to explain the 1976 meeting at RSE in their *680 testimony. Both testified that it was a meeting of the Pennsylvania Association of Asphalt and Tar Applicators (PAATA) and specifically recalled that the meeting took place on December 6, 1976, well after the bidding season. Both believed it was attended by Tim Nicholas (N.T. pp. 1077-79, 1223-24).
In support of their contention that the meeting was held in December 1976, defendants state that Al Kane agreed that it could have been in December of that year. Kane, however, testified that he thought the meeting took place in the winter of 1976 (N.T. p. 276). On cross-examination he was asked, "Could that have been in December?" He simply responded, "It could have been" (N.T. p. 311). Nowhere in the record was Kane asked if the meeting could have taken place in December 1976. Since the winter of 1976 ran from December 1975 through March 1976, it is likely that Kane understood counsel's question to refer to December 1975, not December 1976.
The Rimmers' contention that the meeting took place on December 6, 1976 is also rebutted by the testimony of Timothy Nicholas. Through Nicholas the Government introduced into evidence minutes of the PAATA meeting held on December 6, 1976. These minutes show that the meeting on that date was not held at RSE's offices, and that numerous additional association members were present. Nicholas, who was present at the December 6, 1976 association meeting, testified that he did not attend a meeting at RSE on that date (N.T. pp. 1268-70, 1272). The Rimmers contend that the minutes of the December 6, 1976 meeting actually support their testimony because they show that the subject of the meeting was a PAATA seminar program. They argue that since Snyder stated that the seminar program was discussed at the conspiratorial meeting he attended at RSE, Snyder must have been referring to the December 1976 meeting. Walter Rimmer's own testimony provides sufficient evidence to refute this argument. According to Rimmer, planning meetings for the 1977 seminar program were held as far back as 1975 (N.T. p. 1076).
Other evidence linked Walter to the conspiracy. He was placed at the Fat Albert meeting not only by Snyder but by his own admission. Al Kane also testified that on three or four occasions after the Fat Albert meeting he saw Rimmer refer to a township allocation list prepared at the meeting primarily by Murphy while Rimmer prepared bids to be submitted to municipalities. Kane also had access to Rimmer's desk and saw the list there as well (N.T. pp. 278-80).
At trial, Rimmer attempted to discredit Kane's testimony by demonstrating bias on Kane's part in that Kane once offered to aid civil defendants in a case brought by RSE. The evidence, however, is uncontroverted that in August 1978 Kane provided Murray Bryan with a copy of the 1977 allocation list (N.T. pp. 330-31, 591). Kane testified that he obtained this copy by making a xerox copy of the list he found in Rimmer's desk (N.T. p. 320). Rimmer provided a no alternative theory as to how Kane could have obtained a copy of the list if not from Rimmer's desk.
The results of the bid lettings at the municipalities on the list also support the conclusion that Rimmer participated in the conspiracy. At each of the eighteen municipalities which requested bids in 1977, the low bidder among H & M, RSE, and Snyder & Sons was the company under whose name the municipality was listed[21] (N.T. pp. 696-705). Rimmer was responsible for RSE's motopaving bidding in 1977 (N.T. p. 1048). *681 Rimmer attempted to explain these bid results by testifying as to the reasons behind his bid or failure to bid to each municipality on the list. Although he went to great lengths to demonstrate RSE's inability to obtain stone in 1977, Rimmer testified that of the eight townships to which RSE did not submit bids in 1977, the unavailability of stone was the primary reason for failing to bid at only two of them. He later testified that even as to one of those two municipalities, the unavailability of stone was probably only part of his reason for not bidding (N.T. pp. 1108-18, 1152). It would be reasonable for the jury to discount Rimmer's testimony, for to believe that Rimmer was not party to the conspiracy in 1977 requires a belief that the correlation between the bid results and the allocation on the list was the product of a remarkable coincidence. In every instance, RSE's bid, or failure to bid, was consistent with the list.

D. Evidence as to D. Robert Rimmer
D. Robert Rimmer moved jointly with Walter Rimmer for judgment of acquittal or, in the alternative, a new trial. The memorandum filed in support of this motion offered no argument specifically on behalf of Robert, and the arguments made on behalf of both, such as lack of credibility of the witnesses against them, have already been dealt with in the section detailing the evidence against Walter. See section VIII(C), supra.
The evidence of Rimmer's participation in the conspiracy relates primarily to his participation in two conspiratorial meetings. According to Don Snyder, Rimmer met at RSE's new office building with Murphy, Quigley, Snyder, and Walter Rimmer, at which time bids and prices for motopaving work were discussed. Rimmer testified that he did in fact attend a meeting at RSE with Murphy, Snyder and, he believed, Quigley. Following Walter Rimmer's lead, Bob also testified that the meeting was a trade association meeting, that it occurred on December 6, 1976, and that he thought Tim Nicholas was also in attendance, presumably to show that the meeting was a legitimate association meeting held well after the bidding season (N.T. p. 1224). As set forth in subsection VIII(C), infra, there is substantial evidence in the record that the meeting was not held on December 6, 1976, and that it was not attended by Nicholas.
Rimmer was also present, by his own admission, at the Fat Albert meeting in 1977 with Murphy, Quigley, Snyder, and Walter Rimmer (N.T. pp. 1225-26). In his defense Rimmer denied participating in any allocation discussions in Fat Albert, and claimed he was not in the motor home for a substantial portion of the meeting (N.T. pp. 1227-28). Rimmer's credibility regarding this meeting is highly suspect. Aside from his obvious bias, Rimmer was confronted with a prior inconsistent statement. At trial, Rimmer testified as follows:
Q. If I can direct your attention to the Fat Albert meeting in 1977, when you were in Fat Albert and Mr. Murphy started to talk to you about you take these townships and you take these townships, what was your response to that?
A. I didn't respond at all. Walter responded.
Q. And you testified earlier that Walter's response was that he turned it down?
A. Yes.
Q. Isn't it really a fact that you appeared to be interested in what Mr. Murphy was saying?
A. I tried not to let on either way. I was interested in what he was saying, certainly.
Q. Well, isn't it really true that you tried to lull Murphy into a sense of security? About your involvement in this?
A. I would say you could qualify it as that. I tried to stay as neutral as I could and find out as much as I could.
Q. Did you try and lead him on to lead him to believe that you were going to go along with what he was saying?

*682 A. No. I would say I tried to find out as much as I possibly could about what townships he thought were lucrative townships because he knew, at least I felt he knew, what townships had the most tonnages as Walter testified to earlier.
Q. Isn't it really a fact that you promised Mr. Murphy that you would go along with what he was talking about?
A. No, I never promised him I would go along with what he was talking about.
(N.T. pp. 1254-55)
Rimmer was then confronted with the following prior inconsistent testimony given at a deposition on March 11, 1980:
Q. I am on page 586 starting at line six. "Question: When we were talking about the hat drawing in 1977, you mentioned that you and Walter had other plans. What were your other plans? Answer: Same plans that they had always been, to find out what Murphy wanted, appear to be interested and then take the jobs away from him."
Now, if you look at page 587, Mr. Rimmer, starting at line 22. "Did he," which would be Murphy, "seek some kind of commitment that this year things would be different? Yes, we promised him again and we did it again. If anything, Mr. Murphy was a little on the gullible side."
Now, I'll continue on page 588. "Did you ever try and lull him into a sense of security by going along a little bit? Answer: There may have been, like the first two jobs that came out would be way out of the neck of our woods that were just little piddly jobs and we put in a bid for those at a real high bid and then when the big ones came up that Murphy or Snyder were supposed to get, we would just drop in on them. It only worked for us a couple of good ones a year till they caught up with us."
Do you remember those questions and answers, Mr. Rimmer?
A. Yes, I do.
(N.T. p. 1256)
Rimmer did not explain the inconsistencies in these statements. A reasonable jury could conclude from this series of questions and answers that Rimmer was fabricating his testimony, and consequently could disregard it completely when considering the evidence as it related to him.
Since the court found by a preponderance of evidence at the conclusion of the Government's case in chief that Rimmer was a participant in a joint undertaking, it is proper to consider the evidence relating to the acts and statements of the other individuals similarly shown to be participants in the joint undertaking. Upon consideration of all such evidence in addition to the evidence described above, a reasonable jury could find beyond a reasonable doubt that Rimmer was a knowing participant in the conspiracy. The weight of the evidence supports such a finding.
Even assuming, arguendo, that the evidence outlined above forms an insufficient basis to find Rimmer's direct participation in the conspiracy, it would nonetheless provide a sufficient basis for a jury to find beyond a reasonable doubt that Rimmer had knowledge of the conspiracy and the participation of RSE and Walter Rimmer in it and that he failed to stop such participation. Gillen, 599 F.2d at 547.
Rimmer was President of RSE from February 1973 through the end of the conspiracy (N.T. p. 1218). As Walter Rimmer's superior, he was obligated to put a stop to RSE and Walter Rimmer's participation in the conspiracy if he was aware of it. A leap of the imagination is required in order to believe that Rimmer could have attended two conspiratorial meetings at which prices and customer allocation were discussed, including the Fat Albert meeting at which municipalities were allocated by actually drawing names from a hat, without knowing that an agreement among the competitors existed. It would be reasonable for a jury to find beyond a reasonable doubt that *683 Rimmer did in fact have knowledge of RSE and Walter Rimmer's participation in the illegal agreement, and yet took no action to require their withdrawal.

E. Evidence as to RSE, Inc.
The evidence in support of the conviction of D. Robert Rimmer, President of RSE, and Walter E. Rimmer, Vice President of RSE, similarly supports the conviction of RSE, Inc.
Furthermore, the conspiratorial activities of Charles Witmer and Donald Rimmer while officers of RSE are also chargeable to RSE. Witmer admitted his own participation in the conspiracy from 1970 through 1972, and testified that he was initiated into the conspiracy by Don Rimmer (N.T. pp. 158-66).
For the foregoing reasons the motions of the defendants will be denied.

APPENDIX
Q. What was the purpose of these lists that Mr. Murphy made up?
A. Murphy was saying that he was going to take this and we should take this and Snyder should take that.
Q. When did Mr. Murphy come up with these lists?
A. Usually about the beginning of the year he would try to get us to go along with him and said things like well, I'll give you better townships this year, these are your townships.
Q. He is going to give you better than the ones you had before?
A. He is going to give us better than what he tried to give us the year before.
Q. Did he make the offer every year?
MR. KOERNER: Every year since when, since Bob was around?
BY MR. SILFEN:
Q. I assume we are talking only since you were around.
A. I can remember two or three years, I don't think it was every year.
Q. Did you attend a meeting in around March 1977 at which Murphy proposed such a list?
A. I can remember going someplace with  I think it was down to H & M's oil refinery in the motorhome.
Q. In your motorhome?
A. Correct.
Q. Who was in your motorhome?
A. Murphy and Quigley and Walter and myself.
Q. How about Snyder?
A. I think he  I don't know whether he drove down there or met us there.
Q. Did he join you later?
A. He joined us later in the motorhome.
Q. Did you discuss the division of territory for 1977 at that time?
A. Yes.
Q. Was this list or something like this list prepared in practices indicating?
A. No, Murphy had a bunch of names and said we are going to put them in a hat and pull them out.
Q. So that the draw would just be a random that year?
A. Well, after Murphy took out the names that he wanted.
Q. Did you then proceed to draw names out of a hat?
A. After he took the names out, yes.
Q. Did you each take turns, Murphy drew, Snyder drew, you drew?
A. I think we may have drawn two at a time rather than pass it around a lot of times.
Q. Who drew for you, you or Walt?
A. I don't know, I think I might have drawn some and Walt might have drawn some.
Q. Did you keep a record of which ones you drew?
A. I never did.
Q. Did anybody?
A. Well, I think Murphy did. Walter and I had different plans.
NOTES
[1] In McLain real estate purchasers filed suit against real estate brokers in the New Orleans area, alleging that the brokers had fixed their commission and thus violated the Sherman Act. The district and Fifth Circuit courts held that plaintiffs had failed to establish subject matter jurisdiction.
[2] This court notes, however, that the Third Circuit has in the past adopted "a more expansive concept of `affecting commerce' than other courts of appeals ..." J.P. Mascaro & Sons, Inc. v. Wm. J. O'Hara, Inc., 565 F.2d 264, 267 (3d Cir.1977) (footnotes omitted).
[3] Testimony established that one bonding company, headquartered in Baltimore, had Pennsylvania district offices (N.T. pp. 105-106). Even presuming that performance bonds purchased from this company (N.T. p. 130) constituted intrastate transactions, other evidence established that performance bonds were purchased from companies in New Jersey and New Hampshire (Gov't.Exs. 311-E, F, G, H).
[4] This last contention of defendants RSE, Inc. and the Rimmers was discussed for the first time in their reply brief. Presuming it is appropriately raised, the court finds no basis for reversal for the reasons set forth below.
[5] 2. The defendants are charged with violating Section 1 of the Sherman Antitrust Act which prohibits every contract, combination, or conspiracy in restraint of trade or commerce among the several states. An essential element of the claimed violation is that the alleged restraint must be shown to have affected interstate commerce.

In this case the defendants engaged in wholly local activities in their motopaving work in the four-county area. In order for their activities to violate the Sherman Act, you must find that their conduct substantially affected interstate commerce.
To affect interstate commerce means, for example, to restrict or reduce out-of-state purchases of goods or increase the amounts charged customers who pay from out-of-state. The Sherman Act looks for a "pinch" on interstate commerce.
Without a showing of substantial and adverse effect on interstate commerce, you must find the defendants "Not Guilty."
Sherman Antitrust Act, 15 U.S.C. § 1; McLain v. Real Estate Board of New Orleans, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); J.P. Mascaro & Sons, Inc., v. William J. O'Hara, Inc., 565 F.2d 264 (3d Cir.1977); United States v. Women's Sportswear Ass'n, 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805 (1949).
3. The interstate commerce requirement acts as a limitation on the Sherman Act since many situations remain in which the flow of supplies into the state will not be substantial enough to confer jurisdiction.
For example, it has been determined that a conspiracy to control legal advertising did not substantially affect the flow of national advertising, news dissemination and newsprint where the product involved was directed to a purely local market.
The test is not whether the businesses involved in the alleged activities were engaged in interstate commerce, but that the conduct complained of substantially affects interstate commerce.
Doctors, Inc. v. Blue Cross of Greater Philadelphia, 490 F.2d 48 (3d Cir.1973); Page v. Work, 290 F.2d 323 (9th Cir.1961); United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).
[6] A copy of the indictment was sent out with the jury (See Doc't # 94).
[7] The majority opinion in Palumbo looked at unavailability and reliability. In assessing reliability, the majority employed a totality of the circumstances test focusing on the circumstances in which the statement was made and the precise nature of the statement. 632 F.2d at 127. This court views the majority test and Judge Adams' test as essentially the same. Furthermore, the majority appears to have adopted Judge Adams' analysis. 632 F.2d at 128 n. 5.
[8] RSE, Inc. v. Pennsy Supply, Inc., 523 F.Supp. 954 (M.D.Pa.1981).
[9] In addition to the circumstances set forth on p. 10 of this memorandum, defendants RSE, Inc. and the Rimmers assert that civil defense counsel also agreed not to reveal that Snyder was the source of the information (Doc't # 86 at 33 n. 24). Defendants assert that Thomas' inability to recall whether or not non-attribution was agreed upon (N.T. p. 551), combined with Bryan's testimony that civil defendants agreed to "keep [Snyder] as far away from the law suit as possible," (N.T. p. 576) demonstrates conclusively that there was such a condition. The court notes that defendants never specifically asked Bryan whether there was a non-attribution agreement.

Even assuming arguendo, that the record can be read to include a non-attribution condition, such a condition would not render Snyder's statement unreliable. A reasonable person is likely to desire anonymity when he makes statements against interest, particularly when they are true.
[10] Defendants RSE, Inc., and the Rimmers argue in their reply brief that although Mr. Bryan could not grant Snyder official immunity, he could effectively grant the equivalent of such immunity by containing his knowledge of Snyder's complicity. Defendants suggest that such containment would likely occur if RSE, after learning of Snyder's information, decided to settle its claims with the clients of Mr. Bryan and other civil defense counsel. This argument fails to recognize that there was no absolute guarantee that Bryan would "contain" his knowledge or that RSE would decide to settle its claims. Therefore, Snyder still tended to subject himself to criminal liability by making his statement.
[11] The court assumes, without deciding, that the statement against interest hearsay exception is not a firmly rooted one, thus mandating use of the "particularized guarantees of trustworthiness test" in this case. Cf. Olson v. Green, 668 F.2d 421, 427-28 (8th Cir.1982) (custodial statements implicating a third person do not fall within a firmly rooted hearsay exception). But see United States v. Peacock, 654 F.2d 339, 349 (5th Cir.1981) (reliability of declaration can be inferred because declaration was statement against interest, a firmly rooted hearsay exception).
[12] The Ninth Circuit employs four factors set forth in Dutton v. Evans, 400 U.S. 74, 88-91, 91 S.Ct. 210, 219-220, 27 L.Ed.2d 213, to test the reliability under the Confrontation Clause of co-conspirator's statements found admissible under Fed.R.Evid. 801(d)(2)(E). United States v. Fleishman, 684 F.2d 1329, 1339 (9th Cir. 1982). The four factors include (1) whether the declarations contained assertions of past fact; (2) whether the declarant had personal knowledge of the identity and role of the participants in the crime; (3) whether it was possible that the declarant was relying upon faulty recollection; and (4) whether the circumstances under which the statements were made provided reason to believe that the declarant had misrepresented the defendant's involvement in the crime. Id. All four elements need not be present in order to satisfy the Confrontation Clause. United States v. Perez, 658 F.2d 654, 661 (9th Cir.1981). Although this test is not directly applicable to the case at bar since the Snyder statement involves the statement against interest exception to the hearsay rule rather than the co-conspirator provision, this court believes the Snyder statement meets the Ninth Circuit test. Parts (1) and (3): while the statement related to past facts and even assuming that Snyder was relying to some extent on faulty recollection, there was substantial corroboration of Snyder's key assertions; Part (2): Snyder unquestionably had personal knowledge of the identity and role of the participants in the crime; Part (4): the circumstances under which the statements were made have previously been discussed and offer no conclusive reason to believe Snyder misrepresented defendants' criminal involvements.
[13] The court finds no merit to defendants' contention that the court improperly considered evidence not independent of the alleged co-conspirator statements. Defendants point to the court's reference to testimony of Ward Wilson discussing conversations he had with Don Snyder, a co-conspirator, regarding bidding procedures (N.T. p. 767). These statements were appropriately considered by the court in determining whether a joint undertaking existed and Snyder's participation therein. The court did not consider the truth of the substance of Snyder's statements, but only Wilson's testimony that Snyder had contacted him and discussed bidding, direct evidence which was relevant to the court's determination.

The court also rejects defendants' contention that it considered unreliable evidence regarding the Rimmers' participation in the conspiracy. Specifically, defendants cite the court's consideration of testimony that Robert Rimmer was present with Murphy and Quigley when Snyder was asked to prepare a list of desired customers. Although the court did misstate the testimony on this matter by stating that Robert rather than Donald Rimmer had directed Snyder to prepare such a list after meeting with Murphy and Quigley, the mistake does not reflect erroneous consideration of the evidence. The court cited this evidence in support of its consideration as to Quigley's participation, and made no mention of it when considering Robert Rimmer's participation. Thus it is apparent that the court's reference to Robert was a mere slip of the tongue. To the extent it is relevant on these post trial issues since defendant Quigley has not raised the issue, the court notes that an accurate characterization of that testimony would have provided the same support for the court's ruling as to Quigley as the incorrect statement of the evidence had, for the import as to Quigley is the same.
[14] The defendants apparently have abandoned their earlier claim of mutually exclusive defenses.
[15] The court rejects the argument of defendants RSE, Inc. and the Rimmers that Gallagher's rule allowing prejudice to be cured by overwhelming evidence or a curative instruction has been changed by United States v. Swinehart, 617 F.2d 336 such that both factors must be present in order to cure prejudice.
[16] The convicted corporations participated in the conspiracy through the actions of their officials who had pricing authority. United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174 (3d Cir.), cert. denied, 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1970). H & M, Inc. is liable for the acts of William H. Quigley, Jr., President; RSE, Inc. is liable for the acts of Walter E. Rimmer, Vice President, and D. Robert Rimmer, President.
[17] Quigley maintains that the court should consider the record as it existed at the time he made his motion for acquittal at the end of the Government's case in chief. Quigley concedes that this position is "apparently contrary to the Third Circuit's approach which applies the so-called waiver rule ..." (Doc't # 115, p. 33). The waiver rule provides that a defendant who produces evidence in his own behalf after a denial of his motion for acquittal waives his right to object to the denial of the motion. United States v. Trotter, 529 F.2d 806, 809 n. 3 (3d Cir.1976). Furthermore, once a defendant renews his motion, as Quigley did, at the close of the entire case, the court should consider all of the evidence presented. United States v. Agnes, 453 F.Supp. 1256, 1257 (E.D.Pa.1978), aff'd mem. 601 F.2d 576 (3d Cir.), cert. denied, 444 U.S. 933, 100 S.Ct. 278, 62 L.Ed.2d 191 (1979).

The court need not decide whether to ignore the waiver rule in this case as Quigley urges. The court finds sufficient evidence in the record at the close of the Government's case and at the close of the case itself to support Quigley's conviction.
[18] As set forth in Section V, the court may consider co-conspirator statements made prior to Rimmer's participation in the conspiracy.
[19] In his memorandum Rimmer also attacks Witmer's credibility by citing a prior inconsistent statement. At trial, Witmer testified that he was contacted by Bob and Walter Rimmer after a bid letting at Hampden Township in 1973. He had previously testified that it was Don Rimmer, not Bob and Walter, who had contacted him. While these statements conflict, the court notes that the trial testimony of both Walter and Bob Rimmer corroborate the truthfulness of Witmer's trial testimony on this subject (N.T. pp. 1039; 1220-21).

In a further attempt to impeach Witmer's credibility, Rimmer testified that Witmer, while employed at RSE, generally had authority to submit bids, while he himself did not (N.T. pp. 1131-32). This testimony contradicted Witmer's testimony that he had no such bidding authority, but that Walter held such power (N.T. pp. 305-06). Rimmer's testimony had the effect of impeaching his own credibility, rather than Witmer's, since Rimmer was confronted with the following prior inconsistent testimony he gave at a deposition on February 4, 1980:
Question: Don't you think [Witmer] was pretty familiar with bidding those townships when he left?
Answer: No, not really. Mr. Witmer was more in line of sales than bidding. I basically put a lot of the prices in (N.T. p. 1133).
[20] There is a conflict in the record as to the year Snyder joined the conspiracy. Although Witmer testified that Murphy told him Snyder joined late in the 1970 bidding season, F. Murray Bryan testified that Snyder had told him he joined in 1974 (N.T. p. 585). Witmer's recollection is likely more accurate than Snyder's since, having withdrawn from the conspiracy after the 1972 bidding season, Witmer had a better time reference. Furthermore, Ward Wilson's testimony regarding attempts by Snyder to rig bids in 1972 tends to corroborate Witmer's testimony.
[21] RSE and the Rimmers argue that there were motopaving projects done by twenty-two municipalities in the four-county area in 1977 (Doc't. # 86, p. 17). Defendants are apparently referring to testimony given by Walter Rimmer when he mentioned other motopaving work done by RSE in 1977 (N.T. p. 1118). Assuming that there were four additional municipalities which did motopaving work in 1977, that would still not detract from the persuasiveness of the Government's evidence. Since none of the four municipalities named by Rimmer were listed on the allocation list, it can be inferred that those municipalities were not allocated. The indictment does not allege that all municipalities in the four-county area were allocated.